UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

KATHARINE DAWSON, Ph. D.

               Plaintiff

               v.

CITY OF NEW YORK, RICHARD CHIN,
and TIMOTHY TIMBERLAKE,

               Defendants

_____

Dkt. No. 09 cv 5348 (GEL)

COMPLAINT

JURY TRIAL DEMANDED

PRELIMINARY STATEMENT

1.    This is an action for age discrimination in employment, brought under 29 U.S.C. 721, et seq., the Age  Discrimination in Employment Act against the employer, the City of New York (by its Department of Education) and its agents, Richard Chin and Timothy Timberlake.,and under 42 U.S.C. § 1983 with pendent claims under the New York State Human  Rights Law, N.Y. Executive Law § 290, et seq., and under the New York City Human  Rights Code, N.Y. C. Admin. Code § 8-106 et seq..  Plaintiff is a high school teacher who has been employed by the defendants brought to redress age discrimination, an age-hostile  work  environment and reprisal by Defendants for opposition to discrimination.

JURISDICTION

2.    This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1343, to redress violations of her civil rights, and has jurisdiction over pendant  claims based on New York State and New York City law pursuant to 28 U.S.C. § 1367.

1

VENUE

3.      Venue is properly laid in the Southern District of New York, where defendant City

of New York and its Department of Education have their principal place of business,

and where4 the events sued on occurred.

PARTIES

4.      Plaintiff, Dr. Katharine Dawson, is a citizen of the United States and of the State

of New York. At all times mentioned herein Dr. Dawson has been employed as a

teacher by the New York City Department of Education, at the Chelsea Campus High

School, in the Soho Communication Arts Academy. ("SCAA").  Dr. Dawson is seventy

years of age.

5.      Defendant City of New York has at all times mentioned herein maintained the

Department of Education as a department of the City of New York, a municipal

corporation, which has been an employer within the meaning of the Age Discrimination

in Employment Act, with over five-hundred employees, and an employer within the

meaning of the New York State Human Rights Law, New York State Executive Law §

290, et seq., and New York City Human Rights Code, .Administrative Code § 8-106 et

seq.

6.      Defendant Timothy Timberlake was at all times mentioned herein the principal of

Chelsea Campus High School.  At all times mentioned herein, Defendant Timberlake

acted as the agent of Defendant City of New York and its Department of Education, and

as such, as an employer within the meaning of the Age Discrimination in Employment

Act.

7.      Defendant Richard Chin was at all times mentioned herein the assistant principal

2

of Chelsea Campus High School, and the principal of Soho Communication Arts Academy.   At all times mentioned herein, Defendant Chin acted as the agent of Defendant City of New York and its Department of Education, and as such, as an employer within the meaning of the Age Discrimination in Employment Act.

FACTS

8.      On several occasions In October and November, 2006, as Defendant Chin and Plaintiff were casually discussing their outlooks on retirement,  Plaintiff told Defendant Chin that she had considered retiring, but had decided to work another year. Defendant Chin drew the conclusion that their ages separated them from the students and the students' world, both of which were now beyond them.  Plaintiff disagreed.

9.      On or about November 30, 2006, Plaintiff received a letter from Defendant Timberlake which purported to detail her absences for the year, and stated falsely that she had seven full days of absence, and one partial day, and warned that "poor attendance may lead to further disciplinary action, including an unsatisfactory attendance rating."

10.     In fact, the Payroll Secretary's records showed that Plaintiff was absent only five full days, with fractional absences on two days totaling two hours and sixteen minutes. With the exception of one day, these absences were documented as excused medical absences.

11.     These absences had occurred during the period that Plaintiff had a fractured wrist.

12.     On December 14, 2006, Defendant Chin entered the room as Plaintiff was presenting information about Andrew Jackson at the Battle of New Orleans, and how

3

his victory there, and his role as an "Indian fighter" contributed to his popularity and helped him to be elected president.   Defendant Chin interrupted to comment to the students, "Think about it.  If the Indians were still here, there wouldn't be room for us," disrupting the class and requiring Plaintiff to counter the racism in his statement.

13.     On December 18, 2006, as Plaintiff was leaving the building at 6:00 p.m., Defendant Chin made the statement to her: "You are a dinosaur. So am I. You should be replaced by a teaching fellow."

14.     The teaching fellows at the school are all much younger than Plaintiff.

15.     When these comments became too much to bear, Plaintiff informed Defendant Chin that he and she were not the same person, and that he should stop raising the subject of retirement to her.

16.     On January 8, 2007, Plaintiff entered the SCAA's Professional Development meeting a few minutes after the group had assembled.  Defendant Chin was addressing the group.  Defendant Chin looked up at Plaintiff, and in front of her colleagues, told her "[y]ou should retire."

17.     On several other occasions in December, 2006, through March, 2007, Defendant Chin called Plaintiff "a dinosaur" and told her that she should retire.  He added to this his advice that "kids" are different today than before and that he and Plaintiff could not begin to understand them.

18.     When these comments became too much to bear, Plaintiff informed Defendant Chin that he and she were not the same person, and that he should stop raising the subject of retirement to her.

19.     After Plaintiff told Defendant Chin to stop bringing up retirement to her, he

4

stopped doing so, but began to criticize her, often in an angry tone, and to interrupt and disrupt her conduct of her classes.

20.      Over the years, Defendant Chin had come to Plaintiff's classroom only once a year, to perform the required annual official observation.  However, after December, 2006, he made frequent, disruptive visits to Plaintiff's classroom, and made grossly inaccurate and unfair criticism of her work, which in the context of his age discriminatory remarks, contribute to the age-hostile work environment and reprisal which she has been forced to experience.

21.     On January 10, 2007, Defendant Timberlake observed Plaintiff's class, and afterward, wrote a    post-observation report which rated her lesson as "minimally satisfactory."

22.     On the first day of the semester, February 1, 2007, Defendant Chin came into the classroom during a class and interrupted Plaintiff's conduct of the class.  Because of the interruption, Plaintiff was not able to complete the showing of a video, as planned. When Plaintiff confronted him later, he claimed, falsely, that he had interrupted the class because "you were not prepared."

23.      On February 5, 2007, while she was in his office on a clerical matter, Defendant Chin told Plaintiff that she "was winging it in the classroom" and "didn't prepare lesson plans."  In fact, Plaintiff prepares daily lesson plans, and dates them.

24.     At an SCAA meeting, on February 5, 2007, Defendant Chin singled  Plaintiff out by name and designated her teaching of a recent lesson he had observed as an example of "old thinking."  Most of the teachers at SCAA are in their twenties or thirties. Defendant Chin contrasted what he claimed, inaccurately, was Plaintiff's lecturing, with

the younger teachers who were playing music and showing videos in their classrooms. In fact, Plaintiff has incorporated music, videos, and guest speakers into her teaching over the years.

25.       On the afternoon of February 8, 2007, while Plaintiff was teaching her classes, Plaintiff observed Defendant Chin looking into the room through the window in the door several times.

26.       On February 8, 2007, Defendant Chin again came into Plaintiff's classroom at the beginning of the 7th period.  There was an assignment on the board, and the students were beginning to perform it.  Defendant Chin looked at the board, and asked, through clenched teeth, something to the effect of "Don't you remember what I said about interactive learning."  Plaintiff asked Defendant Chin what he wanted her to do, and he said: "Erase the board" and left.  A few minutes later, Defendant Chin returned with paper, and took a seat in the middle of the room, where he remained throughout the period.  Defendant Chin's presence in the classroom on this and other occasions constricted the interaction and rapport between Plaintiff and her students, and so detracted from her ability to teach effectively.

27.       At the time of this occurrence, Defendant Chin had not given Plaintiff an unsatisfactory observation.  Pursuant to the UFT-Department of Education Collective Bargaining Agreement, absent such an "unsatisfactory observation" Defendant Chin had no right to dictate the content of Plaintiff's classroom observation.

28.       On February 12, 2007, at 3:10 p.m., twenty minutes after the end of Plaintiff's official workday, Defendant Chin came into the Faculty Room, which is off limits to administrators, and told Plaintiff that he had been in her room several times that day,

6

and that nothing was on the board.  Plaintiff asked him when this had occurred, and he responded that it had been during the eighth period.

29.     On February 13, 2007, as Plaintiff was arriving at the school, Defendant Chin summoned her to a meeting in his office, where he laid out problems he had with her instruction and management.  When Plaintiff began to respond, he interrupted and said she didn't need to defend herself.

30.     Also on February 13, 2007, Defendant Chin wrote a letter to Plaintiff, which she was required to sign for, which was highly critical of her pedagogy and the condition of her classroom.   Plaintiff wrote a letter back which reminded him that the conditions in her classroom were not of her making and that Plaintiff had tried to correct them despite inadequate furnishings such as bookshelves, and responding to his comments concerning her pedagogy.

31.     On February 15, 2007, Defendant Chin observed Plaintiff's 8th period Global Studies ll class.  He criticized her for not having a seating chart.  He then met with Plaintiff on February 16 to discuss it.  Defendant Chin claimed that the students were not engaged in their work. Plaintiff responded that the students were actively engaged in writing a resume for Alexander the Great, and went on to explain the problems of four particular students.

32.     Also on February 15, 2007, as Plaintiff was leaving for the day, Defendant Chin  demanded that Plaintiff see him.  His face showed anger.  Plaintiff refused, and he demanded to know what her prep period was.  Since Plaintiff does not have class either in First or Second period, she responded that she did not know.  Defendant Chin yelled at her, "how could you not know this?"

7

33.     On February 23, 2007, Plaintiff complained to the New York City Department of Education's Office of Equal Opportunity ("OEO") about Defendant Chin's comments about how she should retire.

34.     On Saturday, March 3, 2007, Plaintiff went to the school to do some work, as she had on many occasions over the years.   As required, Plaintiff told Defendant Chin where she would be, and he told her that all staff had to leave the school by 12:30 p.m. At 12:25 p.m., Defendant Chin came into the room where Plaintiff was working, and told her, "I'm worried about you." Plaintiff told him that she had no time to talk due to time constraints.  His manner and tone became angry, and he told her "You are not allowed in the building."   Plaintiff asked him to clarify what he meant, and he responded, "Never!" and left the room.

24.     Twice on March 5, 2007, and again on March 6, 2007, Defendant Chin came into Plaintiff's classes, and interrupted the class with his own interjections.  After leaving the class on March 6, 2007, Defendant Chin returned with a guest, who he did not introduce.

35.      On March 7, 2007, Plaintiff again saw Defendant Chin looking into the room through  the  window in the door as she was teaching.

36.     On March 9, 2007, Defendant Chin entered the class as Plaintiff was starting the lesson.  He interrupted one student's question, interrupted the class discussion several other times, interjected his opinion during a classroom discussion, and then, when Plaintiff was having students work on developing their own referendums, interjected his own example. "Let's say Dr. Dawson was the worst teacher in the school..."

37.     That day, as the eighth period class was coming in, Defendant Chin tried to get

8

Plaintiff to  agree to meet with him after school, which she refused to do.

38.     That same afternoon, one-half hour after Plaintiff's last class, at 3:20 p.m.,

   Defendant  Chin  came  into  the  Faculty  Lounge,  which  is  off-limits  to  him,  and

interrupted  her  conversation  with  another  teacher  to  demand,  "Do  you  have  that  'Do

Now' from that lesson?"

39.     When another teacher told Defendant Timberlake that the teachers were tired of

 being   harassed  by  Defendant  Chin,  Timberlake  responded  that  it  was  "only  you  and

Dawson," and took no action to curb the harassment.

40.     Through her union, the United Federation of Teachers, Plaintiff filed a grievance

 about Defendant Chin's discriminatory conduct.

41.     On March 14, 2007, a Step One Grievance Conference was held with Plaintiff's

 union representative, Defendant Chin, Plaintiff, and Defendant Timberlake,

42.      Defendant Timberlake's report of the meeting took the words of Plaintiff's

 complaints  about  Defendant  Chin,  and  modified  them  so  that  it  appeared  that  Chin's

comments  were  less  abrasive  and  stark  in  their  message  than  Plaintiff  had  reported.

For  instance,  he  inserted  the  word  "perhaps"  into  my  charge  that   Defendant  Chin  had

said  that  Plaintiff  should  be  replaced  by  a  Teaching  Fellow,  In  describing   Defendant

Chin's  declaration  that  Plaintiff  should  leave  the  building  when  Plaintiff  was  in  on  a

Saturday,  and  that  she  should  not  come  back,  he  omitted  Defendant  Chin's

exclamation,  "Never!"    Defendant  Timberlake  deliberately  ignored  the  evidence  of

harassment  and  age  discrimination  by  Defendant  Chin,  and   found  that   Chin  had  been

out of line only to the extent that Chin himself admitted it.

43.     In response to her complaint of February 27, 2007, an investigator from the

OEO contacted Plaintiff on March 22, 2007.  At that time, Plaintiff acknowledged that Defendant Chin had not made any age-discriminatory remarks in the recent past.  The investigator was abrupt, and did not give Plaintiff a chance to tell him about the other harassment Defendant Chin had engaged in.

44.     By letter dated March 23, 2007, the Director of the OEO informed Plaintiff that, since Defendant Chin had ceased making the comments, the OEO would not investigate, but had informed Defendant Chin in writing that he was not to make comments to anyone regarding their age, or about retirement, and that the OEO had reminded Defendant Chin of the Department of Education's policy against discrimination, harassment and retaliation and had provided him with a copy of the Chancellor's Regulation prohibiting discrimination.

45.     On or about March 27, 2007, Plaintiff's attorney wrote to Defendant Chin, and warned him that if he did not desist from his discriminatory practices, Plaintiff' would file a charge with the Equal Employment Opportunity Commission.

46.     Although Plaintiff's attorney did not point it out in the letter, Defendant Chin was also harassing two other teachers who were over forty years old.  One of them has since left the school.

47.     In or about the beginning of April, 2007, Defendant Chin told Plaintiff, in the context of a minor oversight he was pointing out,  that he was not getting his lawyer, letting her know that he had received Plaintiff's attorney's letter, and making light of it while ridiculing her for having felt she had to involve an attorney to protect her rights .

48.     For the next several months, Defendant Chin seemed to have relented in his campaign of discriminatory remarks on the job.

10

49.     However, after Plaintiff raised concerns about his age-discriminatory behavior, Defendant Chin began engaging in micro-management, in a manner different from the way he acted in past years, or in his supervision of other experienced teachers.

50.     During this period, Defendant Chin, who teaches mathematics, exhibited a new-found willingness to substitute his judgment for Plaintiff's about social studies curriculum questions, discounting her knowledge and experience as an experienced teacher with a doctorate in history.

51.     Plaintiff had received her doctorate in U.S. history in 2004. Since that time, Defendant Chin had frequently failed to use her correct title in addressing her or in making up rosters. He has also spoken mockingly of Plaintiff's doctorate in U.S. history.

52.     This disrespect for Plaintiff's ability and knowledge is based upon his prejudice against Plaintiff because of her age and his desire to compel her to retire, his resentment of her opposition to his age-discriminatory conduct, or both.

53.     In addition to the instances detailed below, during the Fall 2007 semester, Defendant Chin frequently entered Plaintiff's classroom during first and third periods, distracting and upsetting Plaintiff and making her feel that she was constantly under watch.

54.     In June, 2007, Plaintiff had requested Global Studies III, teaching sophomores, for her Fall assignment. In the Fall, she was given three Global Studies I classes. When she inquired of an administrator, Jim Ford, why she had been given Global Studies I classes, she was told that the school had wanted an "experienced teacher" to teach these classes. Yet despite their recognition of her skills as an experienced teacher, during this period, Plaintiff was continuously being surveilled by Defendant

11

Chin in her classroom, being given petty and unfair criticism of her teaching performance by Defendant Chin, had been given a "minimally satisfactory" rating of a teaching observation by Defendant Timberlake.

55.    In October, 2007, Defendant Chin made several visits to Plaintiff's classroom, and made criticisms of her teaching based on these visits, and on his observations from the hallway as he passed her classroom.

56.    On October 4, 2007, Defendant Chin observed Plaintiff's First Period class in Global History, and wrote a post-observation report on October 14, 2007, rating her lesson as "unsatisfactory," and placed this rating in her personnel file.  Plaintiff's lessons had been reviewed once a term during the ten years she had been teaching in the New York City school system.  This was the only "unsatisfactory" rating for a lesson in her personnel file.

57.    As a result of this "unsatisfactory" rating of her lesson, Plaintiff was required to meet with Defendant Chin on a weekly basis, cutting into her class preparation time. Defendant Chin was usually very hostile during these meetings.

58.    Defendant Chin came into Plaintiff's third period class on October 19, 2007, and later wrote a criticism of her teaching of this class,  which he placed in her personnel file, because she had reviewed aloud with the class the homework assignment she had written on the board.

59.    Defendant Chin walked past Plaintiff's door during fifth period on October 19, 2007,  and later wrote a criticism of her conduct of the class based on what he saw as he walked past the classroom window, claiming that at the time he walked by there was no "Do Now" or "Aim" on the board.  In fact, these are teaching tools, not mandatory

12

parts of every minute of classroom time.  Defendant Chin placed his criticism based on this passing observation in Plaintiff's personnel file.

60.      Defendant Chin came into Plaintiff's first period class on October 22, 2007, and later wrote a criticism, which he placed in her personnel file, because he claimed that the topic she had been discussing with the class for the first ten minutes of the class was different from the one that she took up with the class after he came in.

61.      Defendant Chin also visited Plaintiff's fifth period class on October 22, 2007, and later wrote a criticism, which he placed in Plaintiff's personnel file, because she had written as a "Do Now" for the students to take out certain homework assignments which she planned to review with them.

62.       In response to a notice Defendant Timberlake had sent Plaintiff, on November 6 and 7, 2007, she attended a seminar on the United States Supreme Court sponsored by the Street Law Publishing Company, after receiving assurances from either Defendant Chin or Defendant Timberlake that the school would reimburse her registration fee, and after Defendant Chin had Express Mailed her application.  It was a requirement of the Street Law Publishing Company, which reimbursed the school for the cost of a substitute teacher while she was attending the seminar, before attending the third day of the seminar,  that each teacher give two class lessons on the Supreme Court.

63.      However, after she gave her first lesson on the topic "How Does the Supreme Court Decide Which Cases to Hear," Defendant Chin criticized Plaintiff for teaching a lesson that was not on the Regents Exam.

64.      While the criteria for certiorari are not on the Regents, the lesson Plaintiff taught would help the students to use the reasoning process in grasping this topic which they

13

would need for the Regents.   The cases the students read concerned current events, such as the constitutionality of lethal injection.   Finally, the lesson underscores the role of the Supreme Court in deciding the constitutionality of laws, a topic frequently asked about by the Regents.

65.    Defendant Chin was also critical of Plaintiff conducting a lesson in which representatives of the organization "Farm Sanctuary" provided an interactive presentation that included a writing warm-up, video clips of animals suffering in slaughterhouses, and a discussion of an alternative vegetarian diet, with vegan tidbits that the students sampled.   Again, Defendant Chin criticized the class because this was not material which would be on the Regents exam.

66.    In fact, the lesson related indirectly to Regents Global Studies topic of the requirements of Judaism and Islam for humanitarian slaughter.

67.    On November 15, 2007, Defendant Chin came into Plaintiff's first and third period Global Studies classes . Plaintiff had given these classes a quiz on Judaism, which the class had learned about on the previous day.

68.    During the eighth period of that day, her preparation period, Defendant Chin dashed up to Plaintiff in the hall as she was walking toward the bathroom.   Defendant Chin told Plaintiff that he had noticed that her quiz directed the students to write everything they knew about Judaism, and to explain the terms they used.   Defendant Chin told Plaintiff that she should have provided the students with a list of terms, since they couldn't remember anything.   Plaintiff told him why she disagreed.   Despite her disagreement, Defendant Chin insisted that she should agree to provide the terms in the quiz.   Plaintiff finally told him that she would at another time, and that she needed to go

14

to the bathroom.  He offered to accompany her, which she declined.

69.     About a week before the Thanksgiving break, Plaintiff was in Defendant Chin's

office with the computer technician, to make single copies of documents.  The computer

technician pointed out that the copy machine would make double-sided documents

automatically, and he and Plaintiff were trying to ascertain which way to the original

documents should be placed into the machine, when Defendant Chin overheard them.

Plaintiff began interjecting instructions, although he did not know what they were trying to

do.   He then commented that his talking to me could be construed as harassment,

demonstrating his inability to take seriously Plaintiff's concerns about his discriminatory

and retaliatory conduct.

70.     On November 28, 2007, Plaintiff was giving a lesson on city-states, when

Defendant Chin came into the room, momentarily distracting her.   Plaintiff was

developing the class's vocabulary on political units. Since the students couldn't recall

what a city-state was, Plaintiff tried to jog their memories by reminding them of where

city-states were, and mentioned that the first civilization arose in Mesopotamia, and that

the many city-states were in Sumer in Mesopotamia.   At that point, Defendant Chin

departed.

71.     On the same day, during seventh period, Defendant Chin came to the doorway as

Plaintiff was working with the students on a project concerning Persian emperors.

Defendant Chin told Plaintiff that he was concerned with her usage of language.

Repeating what she had said about Mesopotamia as the first civilization, he said that

civilization began here, presumably meaning North America. Plaintiff told him that

according to the textbook, there were four river valley civilizations, originally, and

15

demonstrated to him what and where they were by questioning the class, who were able to provide the names for three of the four.  Defendant Chin then left the room.

72.     Defendant Chin had also visited Plaintiff's fifth period U.S. history class that day.

73.     On November 29, 2007, Defendant Chin entered Plaintiff's second period Global Studies class,  as the students were taking a quiz.   Plaintiff did not notice he was there because she was busy taking attendance, and the Special Education teacher, Mr. Geoffroy, also did not know why Defendant Chin was there.

74.     On the same day, during the eighth period, Plaintiff was pulling her bookcase out of Room 214, to return it to Room 213, as she did daily.  Mr. Haskins, the Special Education teacher in that room, had wanted to close the door, but had left it open for her. Defendant Chin approached Plaintiff and told her to leave the room.  Plaintiff told him that she was about to do so, and pulled the bookcase out.  Defendant Chin ordered her to leave the door open.  Plaintiff replied that Mr. Haskins had wanted her to close it, so she did.

75.     On December 5, 2007, Defendant Chin came into Plaintiff's class during the fifth period.  Although, according to his own note, Defendant Chin did not enter the class until thirteen minutes after it began, he criticized Plaintiff for supposedly not beginning the class on time, which he apparently equated with having a "Do Now" assignment on the board.

76.     On one occasion in December, 2007, Defendant Chin ran up to Plaintiff and yelled at her in the school hallway to meet him in eighth period in his office, and to bring her union representative.

77.     In or about December, 2007, because of the stress she was experiencing on the

job,   Plaintiff went to see a physician, Dr. Christine Mosse.   Dr. Mosse measured Plaintiff's blood pressure, which ordinarily had a range of 110-130/70-90, as having a systolic blood pressure level of 150 and a diastolic level elevated over Plaintiff's ordinary range.

78.    On or about Thursday, January 3, 2008, Plaintiff had given her first period Global Studies 1 class the assignment to begin research and take notes in preparation for a presentation on Sparta and Athens, and a subsequent take-home essay test. Plaintiff had provided all students with a "frame," a graphic organizer for note taking, assigned each student to a group, and designated the group's research topic. Plaintiff assigned them the homework assignment of completing their research.

79.    On Monday, January 7, 2008, Defendant Chin came into Plaintiff's classroom during the first  period Global Studies class. It was a very chilly day, and there were very few students in attendance.   All but one of the four students were at work on their research, and one was in conference with Plaintiff Defendant Chin looked at the board, which had the "Do Now," "Begin work on your Frame."   Plaintiff had confirmed at the beginning of the class that each of the students had a frame with the handout containing the topic, aim and directions, so she had not written an Aim on the board.

80.    Defendant Chin returned to the class during the same period that morning, and looked  over the shoulders of the students to see what they were writing.  He made a third visit during the same period.   All the students except for one, who was in conference with Plaintiff, and one who had come in late, were at work on the assignment.  On one of the two last visits, he went to the desk of the one student who had come in late and who had been resting his head on the desk, and removed him from

17

the classroom.

81.    That day, during eighth period, Plaintiff met with Defendant Chin for a pre-observation meeting prior to her official observation. Defendant Chin was hostile, abusive and highly unprofessional. He berated her.  Chin addressed Plaintiff in a scornful and bullying manner. He exhibited anger during the meeting, and demeaned her past work. During the meeting, Defendant Chin interrupted Plaintiff several times while she was responding to his questions.   He expressed displeasure and contempt for her thoughts and past work, and sneered at her ideas. Since there was no one else in the office, Plaintiff did not feel free to leave, lest Defendant Chin fabricate a charge of insubordination.

82.    They determined that Defendant Chin would observe Plaintiff's Period 7 Global Studies class the next day.  Instead of telling her what he expected of the lesson he was to observe, he began interrogating Plaintiff about the lesson, which was dated October 4, 2007, and which Plaintiff hadn't seen since that date. Plaintiff prepared a developmental lesson for the class to be observed, per Defendant Chin's request.   Plaintiff had specifically asked Defendant Chin if he wanted a developmental lesson, or one involving group work.

83.    On January 8, 2008, Defendant Chin came to Plaintiff's first period class and sat down.   He stayed for the entire period, although Plaintiff and Defendant Chin had confirmed that the observation would take place in the seventh period. Plaintiff stood at the board, recording students' comments as they made their group presentations from their seats.

84.    After the class, Plaintiff asked Defendant Chin why he was there, since they had

agreed he would observe her seventh period class.   Defendant Chin responded that Plaintiff had said she didn't care.

85.   To the contrary, Plaintiff had indicated In the pre-observation conference, that first period was not good because so many students arrived late, third period was not a good class for her, and that seventh period would be good for her because she had a good relationship with the class.

86.   Plaintiff was scheduled to meet with Defendant Chin during period 8 on January 8 for a post-observation meeting.   The horrible tenor of the pre-observation meeting had left Plaintiff feeling emotionally battered and exhausted.   Therefore, Plaintiff decided that in the best interests of her health, she would not make the period 8 meeting with him on Tuesday.   Instead, she left school at eighth period, feeling ill.   Plaintiff informed Defendant Chin and the payroll secretary of her decision.

87.   On Wednesday, January 9, 2008, Plaintiff met with Defendant Chin for her post-observation of the class that he had observed the day before.   Defendant Chin stated that the students did not have frames, or that they were blank.   This was not true, and Plaintiff realized that Defendant Chin had confused the class he observed with the one he had visited on Monday. Plaintiff asked Defendant Chin how the students could present then. He replied: "from 'off the cuff.'" He told Plaintiff that the lesson was unsatisfactory.   Defendant Chin never acknowledged that he had failed to observe the class they had scheduled, for which Plaintiff had developed a developmental lesson.

88.   On January 9, 2008, right after her post-observation with Defendant Chin, Plaintiff passed one of her first period students in the hall, and asked her if she had written her essay Plaintiff had assigned on the difference between Athens and Sparta.   She

19

responded, "not yet."  Plaintiff asked if she had her frame, and she said that it was at home. Plaintiff asked if she had it the day before.  She said that she did.  Plaintiff asked her who else had one, and she named another student who had a frame and said that the other student had asked to see her frame.

89.     On January 15, 2008, Defendant Chin came to Plaintiff's classroom and mentioned  that Plaintiff should  be on her toes because visitors would be coming to the school.  Plaintiff took the opportunity to tell him that the Social Science teachers would be giving a uniform test, which they had all collaborated on, and that she would be getting a copy from Mr. Biederman.  Defendant Chin responded disparagingly, " Does this mean you do not have an exam prepared?" (He had asked the Soho Arts Communications Academy teachers to turn in their exams by January 11, 2008.  Plaintiff had not done so yet.)  Plaintiff indicated that she had not been able to make up an exam yet.

90.     Defendant Chin accused Plaintiff of not being frank with him, by not telling him she had not done  an exam.  He told Plaintiff that he still wanted an exam from her.

91.     In fact, after years of teaching the same subjects, it would have presented no difficulty for Plaintiff to adapt questions from tests in earlier years to prepare a test, but at this point, Defendant Chin's demand was for her to do work which would have no purpose, since all Global Studies 1 classes would be taking a uniform exam agreed to by all global studies teachers.

92.     On January 18, 2008, the last day of the class, Plaintiff had decided to empower the students by having them evaluate their time with me during the term.  Plaintiff wrote on the blackboard as a "Do Now":

20

1) What did you dislike most about this class?  Write honestly and without malice.

2) What did you like the most about this class?

93.     Plaintiff had assigned earlier Global Studies 1 classes a "Do Now" relating to current events class work, the Iraq war.   The Aim on the board was about the chronology of the Iraq war, as well as the etymology of the word "chronology."   The Task gave the students a choice between answering questions based on the chronology of the war provided to them in a handout or to read an article about the effect of the war on Iraqi teenagers.

94.     As seventh period students were responding to the "Do Now," Defendant Chin entered the classroom and looked at the board.   He said to Plaintiff that the "Do Now" had nothing to do with the classwork.   At the end of the period, as Plaintiff's prep period was starting, Defendant Chin asked Plaintiff to meet him in the hall and then asked Plaintiff to stand next to him at the radiator.   He began to counsel Plaintiff on the alleged deficiencies of the lesson and warn her in various ways what would happen when the Department of Education came into her classroom.

95.     This went on for some time, until there was an uproar down the hall.   Defendant Chin ran off, gesturing that Plaintiff should wait there for him to return.

96.     The seventh period Global Studies class was a freshman class.   There were five students in the class who had behavioral issues, some due to immaturity, and others with diagnosed attention deficit disorder.   All five of these students were in attendance, seated, and at least three engaged in writing, and the rest of the class was also engaged.   Yet Defendant Chin never acknowledged the positive aspects of Plaintiff's classroom aspects and motivational skills.

21

97.     This one-sided negative critique of Plaintiff's classroom performance was typical
of Defendant Chin's response to Plaintiff's teaching during the period commencing in the
Fall of 2007.

98.     During the semester that began in the Fall of 2007, Plaintiff had a U.S. History I
class which she taught along with a Special Education teacher.  A number of students in
that class posed serious behavior problems, and threw large text books, and one student
pulled books off the open shelf and threw them.  That same student destroyed expensive
equipment in the art classroom.

99.     Plaintiff sought Defendant Chin's assistance, as her supervisor, in addressing
the behavior problems of the students in this class were making for an unsafe
environment and one inhospitable to teaching and learning.  But Defendant Chin, who
found time to visit Plaintiff's classes on so many occasions during the semester, almost
never came to this class, and did not address the problem of the behavior of the student
who pulled books off the shelves and destroyed equipment, although Plaintiff wrote letters
to both Defendants Chin and Timberlake asking for their help with the behavior problems
in this class.

100.    On three successive days, February 4 through 6, 2008, Defendant Chin engaged
in harassing behavior toward Plaintiff.

101.    On February 4, 2008, in a Soho Communications Art Academy meeting,
Defendant Chin used a "Do Now" he had seen on her board during a flash visit, and
which he misquoted,  as an example of what he found lacking in teachers' work.  Plaintiff
had taken the "Do Now" from a reading prompt in the teachers' edition of Junior
Scholastic. Plaintiff was using for the class that day. Plaintiff's "Do Now" had instructed

22

the students to list as many world leaders as they could.

102.    Defendant Chin said that the "Do Now" read "Write about three world leaders,"
 and stated that the students did not know enough to write anything, and claimed that he
had seen the students not writing anything.  He stated that in keeping with the school's
"Reading/Writing" initiative, the teacher should have had students read three paragraphs
about world leaders and then write about them.

103.    Had Plaintiff done so, it would have taken at least fifteen minutes, as students are
 slow readers and reluctant writers.  Defendant Chin had directed her to keep her "Do
Now"s to six to ten minutes in length.  Defendant Chin, having left the class after a
lightning visit, was unaware that the rest of the period was devoted to reading an article
on world leaders and discussing concepts and vocabulary in the article.

104.    The next day, as she approached the Academy meeting Plaintiff joked for a
 moment with a couple of her students, and arrived smiling at the door.  Defendant Chin
stood at the door, arms crossed over his chest, and a grim look on his face.  In stead of
greeting Plaintiff in a professional manner, Defendant Chin demanded "So you still think
this is fun?" in a sarcastic and insulting tone.  Plaintiff does not engage Defendant Chin in
personal conversation, but speaks to him only about professional matters.

105.    On February 6, 2008, Defendant Chin entered Plaintiff's classroom for 0 period
 tutoring and first period, just after the 0 period had ended.  A first period student had
entered during 0 period, and Plaintiff had asked him to collate maps for a map packet.
The student was just finishing the task.  Defendant Chin looked at the student and
demanded "what are you doing?" implying that the student should already be doing
Global Studies work.  At that point, there were only two students in the classroom, and

Plaintiff had been about to turn to the board and write a "Do Now" when Defendant Chin entered.  After Defendant Chin left the room, the student asked Plaintiff, "why doesn't Mr. Chin like you?"   Defendant Chin's abrasive manner made it the start of Plaintiff's day unpleasant.

106.    On April 17, 2008, Plaintiff entered the dean's office, in which Defendant Chin had his desk, to make single copies of the U.S. History 2 Multiple Choice exam.   Plaintiff asked Defendant Chin to enter the code on the copier, since he had recently changed the code.  Defendant Chin told Plaintiff that he had told her in the weekly meeting the day before to approve her lesson plans that he did not approve of the exam's format.    As many teachers do, Plaintiff had cut and pasted the exam questions from previous Regents exams and typed a heading at the top, rather than word processing the entire exam.   Plaintiff responded that the exam did contain cartoons, primary sources, and multiple choice questions, all garnered from previous Regents exams.  Stiill, Defendant Chin refused to accept the exam due to the cut-and-paste format.  Plaintiff commented that she supposed that prior exams could be accessed on the Internet, and moved to Microsoft Word to compile an exam, but that she had only learned word processing to do her dissertation, and did not know how to do the other procedure.  Plaintiff responded to Defendant Chin's insistence on disapproving the cut-and-paste format, "[g]et me a secretary, then."  At this remark, Defendant Chin got up and came at Plaintiff as she was moving toward the door, and yelled, "[y]ou're being insubordinate. I don't have a secretary Leave my office." Plaintiff asked Defendant Chin how her remark could be considered insubordinate.  Defendant Chin told Plaintiff not to raise her voice to him, even though she had not raised her voice.  Defendant Chin appeared angry, and had just barred Plaintiff

24

from being in the dean's office.

107.    In or about the Spring, 2008 semester, Plaintiff learned from one of her students,

to her shock and disgust,  that Defendant Chin had been exploiting the student by calling

the student out of classes to question him about what Plaintiff was teaching.

108.    Plaintiff had seen Dr. Mosse for a second time in or about June, 2008.  But when

Plaintiff attempted to see Dr. Mosse for a third time in December, 2008, Dr. Mosse

declined to see her, telling Plaintiff that Plaintiff was involved in a lawsuit, and that she,

Dr. Mosse, didn't want to get into the middle of it.  Upon information and belief, Defendant

Chin and/or Defendant Timberlake had informed Dr. Mosse of Plaintiff's legal action.

109.   Defendant Chin does not generally make disparaging remarks about the younger

teachers to their colleagues or their students, does not interfere with their teaching,

constantly does not surveill and spy on them, and does not yell at them or exhibit anger

toward them to nearly the extent that he did to Plaintiff.

110.    Defendant Chin's behavior constituted the creation of a hostile work environment

based  upon  Plaintiff's  age,  and  in  retaliation  for  her  opposition  to  employment

discrimination based upon age.

111.    Defendant Chin's conduct was acquiesced in and joined in by Defendant

Timberlake and was acquiesced in by Defendant New York City and its Department of

Education.

112.    Defendants' conduct unreasonably interfered with Plaintiff's work  performance.

113.    Plaintiff was caused to be distressed emotionally by Defendants discriminatory

conduct.

114.    On or about March 11, 2008, Plaintiff filed an administrative charge with the New

York State Division of Human Rights, which dual filed it with the Equal Employment Opportunity Commission (EEOC).

115.    On or about March 15, 2009, Plaintiff received a Right to Sue letter from the EEOC.

116.    Defendants' conduct constituted a violation of the Age Discrimination in Employment Act, 29 U.S.C. § 721, et seq.

### As a Second Cause of Action

117.    Plaintiff repeats as if stated here in full paragraphs 1- 116 of the complaint.

118.    Defendants acted pursuant to a de facto policy of Defendant New York City and its Department of Education of harassing older teachers, making evaluations of their teaching which found their teaching "unsatisfactory", and ostracizing them from younger teaching fellows, with the purpose and effect of compelling them to leave the job, as a cost-saving measure.

119.    Defendants' conduct deprived Plaintiff and other older teachers of the equal protection of the law, in violation of the Fourteenth Amendment to the United States Constitution.

120.    Defendants' conduct violated 42 U. S. C. § 1983.

### As a Third Cause of Action

121.    Plaintiff repeats as if stated here in full paragraphs 1- 120 of the complaint.

122.    At all times mentioned herein, Plaintiff was a tenured teacher with a property interest in her continued employment by Defendant City of New York and its Department of Education.

123.    Defendants' actions were carried out with the intention of forcing Plaintiff to retire

from her job, in an attempt to deprive her of her property rights, in violation of the due process clause of the Fourteenth Amendment.

124.    Defendants' conduct gives rise to a cause of action under 42 U.S.C. § 1983.

## As a Fourth Cause of Action

125.    Plaintiff repeats as if stated here in full paragraphs 1- 124 of the complaint.

126.    Defendant City of New York and its Department of Education have a de facto policy of maintaining an office for the investigation and resolution of allegations of complaints of discriminatory practices which fails to take seriously such allegations, performs perfunctory investigations or no investigation, does not discipline or refer for discipline persons in the employ of the City of New York and its Department of Education who engage in discriminatory employment practices, and otherwise maintain a policy of tolerating and discriminatory employment conduct by Department of Education employees and of failure to train, supervise and/or discipline adequately to prevent such discriminatory conduct.

127.    The discriminatory acts of Defendants Chin and Timberlake were proximately caused by these policies of Defendant City of New York and its Department of Education.

128.    These policies of the Defendant City of New York and its Department of Education caused violations of Plaintiff's constitutional rights for which Defendant City of New York Department of Education is liable under 42 U.S.C. § 1983.

## As a Fifth Cause of Action

129.    Plaintiff repeats as if stated here in full paragraphs 1-128 of the complaint.

130.    The actions of Defendant City of New York and its  Department of Education, aided and abetted by Defendants Chin and Timberlake, violated Plaintiff's right to be free of

27

discrimination based upon age and reprisal for her opposition to discrimination secured by the New York State Human Rights Law, Executive Law § 290, et seq.

131.  Plaintiff's administrative complaint with the New York State Division of Human Rights was dismissed for administrative convenience.

As a Sixth Cause of Action

132.    Plaintiff repeats as if stated here in full paragraphs 1- 131 of the complaint.

133.    The actions of Defendant City of New York and its Department of Education, aided and abetted by Defendants Chin and Timberlake, violated Plaintiff's right to be free of discrimination based upon age and reprisal for her opposition to discrimination secured by the New York City Human Rights Code, Administrative Code § 8-106 et seq.

Wherefore, Plaintiff respectfully requests judgment against Defendants on her causes of action for compensatory damages, and against Defendants Chin and Timberlake for punitive damages, an Order of this Court directing Defendants to purge Plaintiff's personnel file of negative evaluations and comments placed in it by Defendants Chin and Timberlake, together with an award of reasonable attorneys' fees and the costs of this action, and such further, other and different relief as this Court deems just in the premises.

Yours, etc.,


Aaron David Frishberg (AF 6139)
a member of the bar of this Court
Attorney for Plaintiff
116 W. 111th Street
New York, NY 10026
212 740 4544

JURY DEMAND

Plaintiff demands trial by jury of all issues triable by jury.

                               _____

                               Aaron David Frishberg (AF 6139)