UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KATHARINE DAWSON, Ph.D.,

                              Plaintiff,

              v.

CITY OF NEW YORK, NEW YORK
CITY DEPARTMENT OF EDUCATION,
NEW YORK CITY, BOARD OF
EDUCATION, RICHARD CHIN, AND
TIMOTHY TIMBERLAKE,

                              Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 19, 2013

**MEMORANDUM
OPINION & ORDER**

09 Civ. 5348 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

          Plaintiff Katherine Dawson, a former employee of the New York City Department

of Education ("DOE"), brings this age discrimination action under 29 U.S.C. § 721, et seq., the

Age Discrimination in Employment Act ("ADEA"), 42 U.S.C. §1983, the New York State

Human Rights Law ("NYSHRL"), New York Executive Law §§ 290, et seq., and the New York

City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code § 8-101 et seq.  Defendants

moved for summary judgment on all of Plaintiff's claims.  The Court granted the Defendants'

unopposed motion in an order dated March 30, 2013.  (Dkt. No. 37)  The reasons for the Court's

decision are set forth in this opinion.

## BACKGROUND

          Dawson claims that from in or about December 2006 until the end of the 2007-08

school year she was discriminated against on account of her age and subjected to a hostile work

environment.  Dawson claims that she was subjected to excessive monitoring, scrutiny, and

criticism, received an "Unsatisfactory" rating for the 2007-08 school year, and was

constructively discharged.  (Am. Cmplt. (Dkt. No.12) ¶¶ 16-108)  Dawson also alleges that

defendants retaliated against her after she complained to the Department of Education's Office of Equal Opportunity in February 2007, and to the New York State Division of Human Rights on March 4, 2008.  (Id. ¶¶ 49, 129-33)

## I.      UNDISPUTED FACTS AND PROCEDURAL HISTORY

### A.      Parties

Dawson was in her late 60's when she began to experience alleged age discrimination.  (Def. R. 56.1 Stmt. ¶ 4)[1]  She began teaching in the New York City school system in 1963, but resigned in 1967.  (Def. R. 56.1 Stmt. ¶ 2)  She returned to DOE in 1997 as a teacher at Chelsea High School ("Chelsea").  (Id.)  Dawson retired in June 2009.  (Def. R. 56.1 Stmt. ¶ 3)

Defendant Timothy Timberlake became the principal at Chelsea in 2002 and remained in that position through the 2007-08 school year.  (Def. R. 56.1 Stmt. ¶ 5)  Timberlake was in his late 40's at all relevant times.  (Def. R. 56.1 Stmt. ¶ 6)  Defendant Richard Chin was an Assistant Principal at Chelsea between 1998 and July 1, 2011, when he retired.  (Def. R. 56.1 Stmt. ¶ 7)  Chin was in his late 50's at all relevant times.  (Def. R. 56.1 Stmt. ¶ 8)

### B.      Dawson's Employment at Chelsea 2002-06

At the start of the 2002-03 school year, DOE assigned Timberlake to Chelsea.  (Def. R. 56.1 Stmt. ¶ 9)  Timberlake divided Chelsea into three separate academies:  Soho Business Academy; Chelsea Technical Academy; and Soho Communication Arts Academy.

---

[1]  Dawson filed no response to DOE's Local Rule 56.1 statement.  Where a party does not to respond to an adversary's Local Rule 56.1 statement, that party is deemed to have admitted all of the facts set forth in the Rule 56.1 statement.  See Amnesty Int'l USA Clapper, 638 F.3d 118, 129 n. 13 (2d Cir. 2011) (citing Gubitosi v. Kapica, 154 F.3d 30, 31 n.1 (2d Cir. 2998)); see also S.D.N.Y. Local Rule 56.1(c)("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed admitted for purpose of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party.").

(Def. R. 56.1 Stmt. ¶¶ 11-12)  Timberlake also implemented new teaching strategies.  (Def. R. 56.1 Stmt. ¶¶ 11-12)

Timberlake assigned Chin as the Assistant Principal at Soho Communications Arts Academy ("Soho").  (Def. R. 56.1 Stmt. ¶ 16)  Dawson selected a teaching position at Soho in part because she had a cordial relationship with Chin.  (Def. R. 56.1 Stmt. ¶ 17)  During her time at Soho, Dawson's direct supervisor was Chin.  (Def. R. 56.1 Stmt. ¶ 21) Chin evaluated the performance of all teachers at Soho, including Dawson.  (Id.)

Between October 23, 2002 and June 28, 2006, Chin rated Dawson "Satisfactory." Timberlake approved Chin's performance rating, which was based on Chin's "Classroom Observation Reports" and "Annual Professional Performance Review and Reports."  (Def. R. 56.1 Stmt. ¶¶ 22-31)

**C.     Dawson's Performance During the 2006-07 School Year**

During the 2006-07 school year, Dawson's lessons were evaluated on two occasions.  On November 3, 2006, Chin observed Dawson's lesson of the day and rated the lesson "Satisfactory."  (Def. R. 56.1 Stmt. ¶ 33)  On January 10, 2007, Principal Timberlake observed Dawson's lesson of that day and rated the lesson "Minimally Satisfactory."  (Def. R. 56.1 Stmt. ¶ 39)

In late November 2006, Principal Timberlake began complaining to Dawson about her excessive absences.  (Def. R. 56.1 Stmt. ¶ 34)  As of November 29, 2006, Dawson had missed seven full days of class and one partial day.  (Def. R. 56.1 Stmt. ¶ 35)  At a November 29, 2006 meeting, Timberlake informed Dawson of her contractual obligations and the effect of poor attendance on students and staff.  (Def. R. 56.1 Stmt. ¶ 35)  Dawson was further advised that poor attendance could lead to disciplinary action, including an "Unsatisfactory" rating.

3

(Def. R. 56.1 Stmt. ¶ 35)  During Dawson's deposition, she admitted that she was absent "five days and a fraction."  (Def. R. 56.1 Stmt. ¶ 36)  Dawson also testified that the principal has a right to criticize teachers for excessive absences.  (Def. R. 56.1 Stmt. ¶¶ 37-38)

In addition to Dawson's absences, she was also admonished for various deficiencies in her classroom performance, including having a disorganized classroom and talking in the middle of a class session to two students who were not part of the class.  (Def. R. 56.1 Stmt. ¶ 42)  At Dawson's deposition, she admitted to these deficiencies.  (Def. R. 56.1 Stmt. ¶ 43)  Dawson also agreed that the Assistant Principal has a right to inquire of a teacher why he or she is talking in the middle of a class to a student who is not part of the class.  (Def. R. 56.1 Stmt. ¶ 44)

For the 2006-07 school term, Principal Timberlake rated Dawson "Satisfactory." (Def. R. 56.1 Stmt. ¶ 49)

### D.   2007-08 School Year

#### 1.   Classroom Observations

On October 4, 2007, Chin observed Dawson's lesson of the day and rated the lesson "Unsatisfactory."  (Def. R. 56.1 Stmt. ¶ 50)  The Classroom Observation states:

The lesson was flawed for the following reasons:

What is a Do Now?  You are a veteran teacher and should know.  The Do now is a 'learning' activity that may bridge the work done in the previous lesson with today's lesson or is intended to focus thinking on the lesson that is to follow. . . . There was no Do Now.

What was taught in your lesson?  Did you accomplish your aim:  How do we evaluate a presentation and write a thank you letter to guest speakers?  You did not discuss the survey – you merely collected it.  There was no discussion of what a thank you letter was beyond 'Here is the format' . . . . Your students learned nothing from you on how to 'evaluate a presentation' or how to write a thank you letter.

4

Make sure the information you provide is usable.  You spoke about internships with the Farm Sanctuary group.  You did not mention what internships, where they were available, or whom to contact.  You then directed students to look up the website chelseasandbox.com and gave the incorrect web address on the board . . .

I am curious how you will grade these letters as a test.  Since you did not inform students of this test grade until the end of the period, I presume that it was not planned?  I suspect that even the three who turned in papers would be hard pressed to know how they were graded.  Do you get a hundred because the correct letter format was used?  What about content?  You gave no directions there.

Your board work was a visual mess.  The Agenda on the left next to the letter format next to the Do Now appeared to run into one another.  No matter – no one took any notes anyway. . . .

Was there homework given yesterday?  It was not discussed; and, neither, was any collected.

Be advised that if the deficiencies observed in this lesson are not addressed you may receive an unsatisfactory teacher rating . . . .

(Def. R. 56. 1 Stmt. ¶ 51; Ex. V)

On October 22, 2007, Chin sent Dawson a letter stating that she had not used the appropriate "Do Now" to begin her lessons on four occasions.  (Def. R. 56.1 Stmt. ¶ 52)  In a November 7, 2007 letter to Dawson, Chin noted that on several occasions he had observed Dawson fail to put a "Do Now" on the board:

You are a veteran teacher.  You know that the Do Now is vital to securing student engagement in the lesson you prepare daily.  On each of the listed occasions above, what you did was unconnected to the lesson proper that followed.  I met with you and Ms. Scott your UFT representative. . . .

In the presence of Ms. Scott you stated you would endeavor to do the following:

Provide your students with an appropriate Do Now.

The Do Now is done in a timely manner.

(Def. R. 56.1 Stmt. ¶ 53)

On January 4, 2008, Chin observed Dawson's lesson of the day and rated the lesson "Unsatisfactory."  (Def. R. 56.1 Stmt. ¶ 54)  In the Classroom Observation Report, Chin listed the reasons for the "Unsatisfactory" rating.  Many of the reasons were the same as those outlined in the November 7, 2007 letter.  (Def. R. 56.1 Stmt. ¶ 55)

On March 18, 2008, Principal Timberlake observed Dawson's lessons of that day and rated them "Unsatisfactory."  (Def. R. 56.1 Stmt. ¶ 67)  In the Classroom Observation Report, Timberlake stated:

> This was an unsatisfactory lesson for the following reasons:
>
> 1. There was poor planning.  The aim was unclear (focus question), your purpose or performance objectives were unclear. What was expected from your students during this period was unclear.  The do now did not lead into the lesson or help the lesson. . . .
>
> 2. There was poor lesson execution, including poor time management.  You attempted to review the homework that was due, not one student presented or showed their homework. There was no evidence that you collected it.  You evidently forgot about the do now which no one did. . . . Students did not take any notes.  I looked back at their notebooks and there were not many notes taken from previous lessons. . . . Students did little or no work the entire period.  No homework to turn in; no do now assignment, no notes from your review, and no work towards the activity assignment.
>
> 3. I asked you to bring rubrics for grading the assignment and the student[']s work to our post observation conference.  You presented me with two rubrics, one for debate, and one for a group presentation.  Neither would suffice for marking this work.  The student work was dated March 20, 2008.  I can then assume that it took three days to complete the assignment.  You gave me only two pieces of work. One was incomplete, the other was far below standards—How are you working with students to complete the assignment? Or is the whole class receiving zeros.
>
> This was an unsatisfactory lesson. You are hereby advised that continued unsatisfactory lessons may lead to further disciplinary action, including an unsatisfactory rating and disciplinary charges that could lead to termination of your employment.

(Def. R. 56.1 Stmt. ¶ 67)

## 2.    Chin's 2008 Performance Review Sessions with Dawson

On February 8, 2008, Chin sent Dawson a letter advising her that a meeting had been scheduled in which Chin expected her to submit for discussion the following documents: "The lesson plans that you would have brought to me on Wednesday, February 6th. The new set of lesson plans for the following week. Telephone Log Book. Grade Book. Pacing Calendar." (Def. R. 56.1 Stmt. ¶ 56; Ex. Z) In a letter dated February 14, 2008 memorializing a February 13, 2008 meeting, Chin advised Dawson that he had requested a meeting to once again discuss: "Incomplete grade book. Incomplete lesson plans. No pacing calendar." (Def. R. 56.1 Stmt. ¶ 57; Ex. AA)

In a February 25, 2008 letter to Dawson, Chin memorialized a February 14, 2008 meeting. (Def. R. 56.1 Stmt. ¶59; Ex. BB) Chin wrote, "I asked that you bring to our February 14, 2008 meeting the following documentation: grade book, lesson plans, and pacing calendar. The documentation was not acceptable." (Def. R. 56.1 Stmt. ¶59; Ex. BB) The letter went on to document the deficiencies:

> Your grade book was incomplete. You are assigned five classes. Your grade book lists only one class. . . . I asked you why was only one class listed and how you recorded homework. You responded, "I did not have time to enter the other classes. The homework has been graded, but it is up in my locker."
>
> You did not have lesson plans for the U.S. History class you teach. . . . I asked you about the U.S. history lesson plans. You responded, "I guess I wing it."
>
> You did not have a Pacing Calendar. You informed me that you did not have time to complete it.
>
> Here is what I expect you to show me at our next meeting: Your grade book will contain provision for the entry of all five classes. Homework assignments are recorded. Global History and U.S. History lesson plans for February 27th to March 5th. Pacing calendar. Be advised failure to provide me with the requested materials in appropriate order may lead to an [u]nsatisfactory teacher rating.

(Def. R. 56.1 Stmt. ¶59; Ex. BB) Dawson admitted at her deposition that Chin's comments regarding these deficiencies were accurate. (Def. R. 56.1 Stmt. ¶ 60) Dawson also admitted that

she may have told Chin, when he asked about her failure to prepare lesson plans, "I guess I wing it." (Def. R. 56.1 Stmt. ¶ 61)

On March 3, 2008 Chin advised Dawson that "[o]n Wednesday, February 27, 2008, you arrived at our weekly meeting. I had asked that you bring with you: grade book, lesson plans, and pacing calendar. I found the quality of the requested documentation to be in an unsatisfactory state." (Def. R. 56.1 Stmt. ¶ 63) After Dawson failed to produce the requested documentation, on March 4, 2008, Chin sent Dawson a letter stating: "The requested documentation is in an unsatisfactory state. Your grade book accounts for only six assignments even though more than three schools weeks have passed since the start of the spring term." (Def. R. 56.1 Stmt. ¶ 64) Dawson once again failed to produce the requested documentation. (Def. R. 56.1 Stmt. ¶ 65) Chin sent letters to Dawson on March 7, 2008, and March 10, 2008, asking her to meet with him again to discuss the status of the missing grade book, lesson plans, and pacing calendar. (Def. R. 56.1 Stmt. ¶¶ 65-66) Chin further advised Dawson that "failure to provide [him] with the requested material in appropriate order may lead to an unsatisfactory annual teacher rating." (Def. R. 56.1 Stmt. ¶ 66)

In letters to Dawson dated April 4, 2008, April 11, 2008, April 14, 2008, April 15, 2008, and April 17, 2008, Chin made recommendations to improve Dawson's instruction. (Def. R. 56.1 Stmt. ¶¶ 69-73) Chin advised her to use lesson templates provided by Timberlake and to utilize an appropriate Do Now to engage students at the start of each class. (Def. R. 56.1 Stmt. ¶ 69) Dawson failed to follow these recommendations. (Def. R. 56.1 Stmt. ¶¶ 70, 71)

Chin met with Dawson on May 2, 2008 to discuss her continued failure to comply with his directives. (Def. R. 56.1 Stmt. ¶ 74) In a May 2, 2008 letter summarizing the meeting Chin stated: "I look upon the weekly meetings as a means of holding a professional conversation

8

with you with the twin goal of discussing pedagogical behavior that benefits our students and advances our professional growth. . . . Be advised that failure to address []in an appropriate manner may lead to an unsatisfactory annual teacher rating. . . ."  (Def. R. 56.1 Stmt. ¶ 74)

On or about June 3, 2008, a student at Chelsea made an allegation that Dawson called him an "a[]hole."  (Def. R. 56.1 Stmt. ¶ 82)  Timberlake sent Dawson a letter on June 12, 2008 informing her of the allegation.  (Def. R. 56.1 Stmt. ¶ 83)  The New York City Office of Special Investigations directed Timberlake to conduct an investigation.  (Def. R. 56.1 Stmt. ¶ 84)  Dawson admitted using the word, but denied directing it at a student.  (Def. R. 56.1 Stmt. ¶ 85)  The investigation concluded with a finding that the student's allegation was unsubstantiated.  (Def. R. 56.1 Stmt. ¶ 86)  Nevertheless, Principal Timberlake sent Dawson a letter advising her that "this incident may lead to further disciplinary action including an unsatisfactory rating and charge which could lead to your termination."  (Def. R. 56.1 Stmt. ¶ 87)

On June 10, 2008, Chin sent Dawson a letter memorializing a meeting that morning.  (Def. R. 56.1 Stmt. ¶ 77; Ex.  PP)  Chin states:

> You came to my office this morning uninvited.  You handed me your final exam and requested I look it over.  I accorded you that professional courtesy.  I observed that there was no provision for the student to enter his/her name, there were no page numbers to your document of 15 pages; and questions are cut out of Regents Exams; and on some pages pasted off-center and a visual distraction for a test-taker. . . . I provided you with feedback to your exam as your supervisor.  You responded to my assistance by remarking that my comments were "not educated."  I find your words uncalled for, insulting, and unprofessional.

(Def. R. 56.1 Stmt. ¶ 77)

### 3.   2007-08 Performance Evaluation

For the 2007-08 school year, Timberlake gave Dawson an "Unsatisfactory" rating.  (Def. R. 56.1 Stmt. ¶ 81)  The performance evaluation rates Dawson "Unsatisfactory" in the following categories:  Pupil Guidance and Instruction, Classroom or Shop Management, and

Participation in School and Community Activities.  (Def. R. 56.1 Ex. RR)  The "Unsatisfactory"

evaluation did not lead to a reduction in Dawson's compensation, nor did she lose promotional or

transfer opportunities as a result.[2]  (Def. R. 56.1 Stmt. ¶¶ 88-89)  The "Unsatisfactory" rating

likewise did not result in Dawson being reassigned, nor did it lead to any disciplinary charges

being brought against her.  (Id.)

> ### E.       2008-09 School Year and Dawson's Retirement

A new principal at Chelsea – Brian Rosenblam – gave Dawson a "Satisfactory"

rating for the 2008-09 school year.  (Def. R. 56.1 Stmt. ¶ 90)  Dawson retired at the end of that

school year.  (Def. R. 56.1 Stmt. ¶ 91)  There is no evidence as to whether Chin was still working

at Soho in 2008-09.  Based on the deposition excerpts provided to the Court, Chin did not retire

until 2011.  (Def. R. 56.1 Stmt.; Ex. B at 9, 16)

> ### F.       Complaints to Administrative Agencies

> #### 1.       Department of Education's Office of Equal Opportunity

On February 27, 2007, Dawson filed a complaint with the Department of

Education's Office of Equal Opportunity.  (Am. Cmplt. ¶43)  Dawson alleged that "there ha[d]

been ongoing harassment, intimidation, and age discrimination from . . . Chin."  (Def. R. 56.1

Stmt., Ex. T)  Dawson claimed that Chin was "trying to micro manage [Dawson's] lessons."

(Def. R. 56.1 Stmt., Ex. T)  Dawson also alleged that Chin "is targeting her and entering her

classroom too frequently," and that "on two occasions [he] interrupted her class and had taken

over the teaching of a topic."  (Def. R. 56.1 Stmt., Ex. T)   Dawson requested that Chin

"[a]pologize in front of collegues and end harassment."  (Def. R. 56.1 Stmt., Ex. T)  On March

---

[2]  During the 2007-08 school year, Timberlake offered Dawson an opportunity to transfer to
another school; she rejected the offer.  (Def. R. 56.1 Stmt. ¶ 93)  Dawson testified that she never
asked anyone about the possibility of transferring to another school.  (Def. R. 56.1 Stmt. ¶ 94)

23, 2007, Timberlake issued a decision denying Dawson's grievance.  (Am. Cmplt. ¶ 47; Def. R.

56. 1 Stmt., Ex. T)  Timberlake's decision states:

> I have found no evidence of ongoing harassment and intimidation of Dr. Dawson.
> Furthermore, Dr. Dawson indicated, in cross examination, that she told Mr. Chin
> not to bring up retirement in their conversations again, and that Mr. Chin has
> complied.  I have seen no evidence of age discrimination.  As far as Mr. Chin
> entering the class, and giving suggestions to improve Dr. Dawson's lessons, Mr.
> Chin does enter all of his teachers['] classrooms on a daily basis.  Dr. Dawson is
> not singled out.  The suggestions that are offered to Dr. Dawson are follow-ups to
> suggestions documented in her observation reports in her file.  This is absolutely
> in the range of behaviors and responsibilities of a Supervising Assistant Principal.

(Def. R. 56. 1 Stmt. ¶ 48; Ex. T)

## 2. <u>New York State Division of Human Rights Complaint</u>

On or about March 11, 2008, Dawson filed a verified complaint with the New

York State Division of Human Rights ("NYSDHR") and with the Equal Employment

Opportunity Commission ("EEOC").  (Def. R. 56.1 Stmt. ¶ 114; Ex. AAA; Am. Cmplt. ¶ 115)

In her complaint, Dawson alleged "age discrimination, including the creation of a hostile work

environment based on [her] age, and reprisal for opposition to discrimination, based on the

discriminatory practices of [her] supervisor, Richard Chin. . . .").  (Def. R. 56.1 Stmt. ¶ 114; Ex.

AAA at DAWSON 1411)

Dawson claimed that "[o]n several occasions in October and November, 2006, as

Mr. Chin and I were casually discussing our outlooks on retirement.  I told Mr. Chin that I had

thought of retiring, but decided to work for another year.  Mr. Chin drew the conclusion that our

ages separated us from the students and the students' world, both of which were now beyond us.

I disagreed."  (Def. R. 56.1 Stmt.; Ex. AAA at DAWSON 1411)  Dawson also complained that

Chin had said:  "You are a dinosaur.  So am I.  You should be replaced by a teaching fellow

. . . . "You should retire."  (Def. R. 56.1 Stmt., Ex. AAA at DAWSON 1412)  Finally, Dawson

alleged that "since December 2006, [Chin] has made frequent disruptive visits to [Dawson's]

classroom, and made grossly inaccurate and unfair criticism of [her] work, which in the context

of [Chin's] age discriminatory remarks, contribute to the age-hostile work environment and

reprisal which [Dawson had] been forced to experience."  (Def. R. 56.1 Stmt.; Ex. AAA at

DAWSON 1413)

   The record does not reveal how Dawson's complaint was resolved.  On or about

March 15, 2009, Dawson received a right to sue letter from the EEOC.  (Am. Cmplt. ¶ 115)

  **G.** **Procedural History**

   On May 3, 2010, Dawson filed the Amended Complaint.  (Dkt. No. 12)  On

December 16, 2012, Defendants served a motion for summary judgment on Dawson.  (Order

(Dkt. No. 27) at 1)  According to a briefing schedule set by the Court, Dawson's opposition was

due on January 12, 2012.  (Id.)  On March 9, 2012, this Court granted Dawson an extension until

March 12, 2012 to file her opposition.  (Dkt. No. 24)  On April 4, 2012, after receiving a letter

from Dawson indicating that she was seeking new counsel, this Court extended her time to file

an opposition to April 30, 2012.  (Dkt. No. 25)

   On April 17, 2012, Dawson's new counsel sent a letter to this Court requesting

that Dawson's time to file an opposition be extended to June 4, 2012.  That application was

granted.  (Dkt. No. 26)  Dawson filed no opposition, however, and on June 18, 2012, this Court

issued an order stating that Defendants' summary judgment motion would be deemed

unopposed.  (Order (Dkt. No. 27) at 2)

## DISCUSSION

## I.     SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).  In deciding a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment."  Cifra, 252 F.3d at 216.

"In cases based on allegations of [discrimination and] discriminatory retaliation, courts must use 'an extra measure of caution' in determining whether to grant summary judgment 'because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence.'"  Thompson v. Morris Heights Health Ctr., No. 09 Civ. 7239(PAE)(THK), 2012 WL 1145964, at *4 (S.D.N.Y. Apr. 6, 2012) (quoting Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006)); see also Ukeje v. New York City Health and Hosp. Corp., 821 F. Supp. 2d 662, 668 (S.D.N.Y. 2011) ("When a case turns on the intent of one party, as employment discrimination and retaliation claims often do, a 'trial court must be cautious about granting summary judgment.'  Because the employer rarely leaves direct evidence of its discriminatory or retaliatory intent, the Court must carefully comb the available evidence in search of circumstantial proof to undercut the employer's explanations for its actions."); Batyreva v. New York City Dep't of Educ., No. 07 Civ. 4544(PAC)(DF), 2010 WL 3860401, at *11 (S.D.N.Y. Oct. 1, 2010) ("Due to the highly fact-specific nature of the inquiry,

an extra measure of caution is needed in awarding summary judgment to a defendant where, as in a discrimination or retaliation case, intent is at issue.").

However, "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to . . . other areas of litigation." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (internal quotation marks and citations omitted). As in any other case, a plaintiff in a discrimination case "must 'do more than simply show that there is some metaphysical doubt as to the material facts.' . . . She must come forth with evidence sufficient to allow a reasonable jury to find in her favor." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). "Mere conclusory statements, conjecture or speculation" by the plaintiff will not defeat a summary judgment motion. Gross v. Nat'l Broad. Co., Inc., 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002); see also Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008) ("Even in the discrimination context . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment.").

Where, as here, the non-moving party "chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004) (quoting Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 2001)); see also D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006). Even an unopposed motion for summary judgment must "fail where the undisputed facts fail to show that the moving party is entitled to judgment as a matter of law." D.H. Blair, 462 F.3d at

110 (quoting <u>Champion v. Artuz</u>, 76 F.3d 483, 486 (2d Cir. 1996)) (internal quotation marks omitted).

## II.   <u>AGE DISCRIMINATION CLAIM</u>

In analyzing a claim of age discrimination, courts in this Circuit employ the burden-shifting framework articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>See</u> <u>Gorzynski v. JetBlue Airways Corp.</u>, 596 F.3d 93, 105-06 (2d Cir. 2010).  Under the <u>McDonnell Douglas</u> framework, a plaintiff "bears the initial burden of establishing a <u>prima facie</u> case of discrimination."  <u>Gorzynski</u>, 596 F.3d at 106 (citing <u>McDonnell Douglas</u>, 411 U .S. at 802).  "The plaintiff's burden at [the <u>prima facie</u>] stage is slight – he may establish a <u>prima facie</u> case with <u>de minimis</u> evidence."  <u>Wanamaker v. Columbian Rope Co.</u>, 108 F.3d 462, 465 (2d Cir. 1997). "If the plaintiff does so, the burden shifts to the defendant to articulate 'some legitimate, nondiscriminatory reason' for its action." <u>Gorzynski</u>, 596 F.3d at 106 (quoting <u>McDonnell Douglas</u>, 411 U.S. at 802).  "Once such a reason is provided, the plaintiff can no longer rely on the <u>prima facie</u> case, but may still prevail if she can show that the employer's determination was in fact the result of discrimination."  <u>Gorzynski</u>, 596 F.3d at 106.  Pursuant to <u>Gross v. FBL Financial Services, Inc.</u>, 557 U.S. 167 (2009), "a claimant bringing suit under the ADEA must demonstrate that age was not just a motivating factor behind the adverse action, but rather the 'but-for' cause of it."  <u>Leibowitz v. Cornell Univ.</u>, 584 F.3d 487, 498 n. 2 (2d Cir. 2009) (citing <u>Gross</u>, 557 U.S. at 175–78).

To establish a <u>prima facie</u> case of discrimination under the ADEA, Dawson must demonstrate that: (1) she was within the protected age group; (2) she was qualified for the position; (3) she experienced adverse employment action; and (4) such action occurred under

circumstances giving rise to an inference of discrimination.  Gorzynski, 596 F.3d at 107 (citing

Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000)).

    **A.**    **Prima Facie Case of Age Discrimination**

        The Defendants argue that Dawson has not established a prima facie case of age

discrimination.  (Def. Br. at 5)  Dawson claims that from in or about December 2006 until the

end of the 2007-08 school year she was reprimanded and subjected to excessive monitoring,

scrutiny and criticisms of her job performance, resulting in an "Unsatisfactory" rating for the

2007-08 school year.  (Def. Br. at 6)  Dawson claims that she suffered adverse employment

actions under circumstances giving rise to an inference of discrimination, and also complains that

she was constructively discharged.  (Def. Br. at 6-7)

        Here, the first two elements of a prima facie case – membership in the protected

class and qualifications for the position – are not in dispute.  Accordingly, the issue is whether

Dawson suffered an adverse employment action under circumstances giving rise to an inference

of discrimination.

    **1.**    **Excessive Monitoring, Scrutiny, and Criticism**

        Dawson's evidence regarding monitoring, scrutiny, and criticism of her

performance is not sufficient for a jury to find that she suffered an adverse employment action.

"[C]ourts in this circuit have found that reprimands . . . and excessive scrutiny do not constitute

adverse employment actions in the absence of other negative results such as a decrease in pay or

being placed on probation," and Dawson offers no evidence of such negative results here.

Uddin, 427 F. Supp. 2d at 429 (quoting Honey v. County of Rockland, 200 F. Supp. 311, 320

(S.D.N.Y. 2002)); see also Weeks v. New York State, 273 F.3d 76, 86 (2d Cir. 2001) ("[i]t

hardly needs saying that a criticism of an employee . . . is not an adverse employment action"

where there is no evidence that the criticism had any negative ramifications for the employee),

abrogated on other grounds, Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002); Hill v.

Rayboy-Brauestein, 467 F. Supp. 2d 336, 355 (S.D.N.Y. 2006) ("micro-management" and

"excessive scrutiny" were not adverse employment actions, particularly where plaintiff's only

evidence of disparate treatment was "her own perception that she was treated differently");

Figueroa v. City of New York, 198 F. Supp. 2d 555, 568 (S.D.N.Y. 2002) ("[b]eing followed by

supervisors is not a materially adverse employment action."); Morrison v. Potter, 363 F. Supp.

2d 586, 591 (S.D.N.Y. 2005) ("being called into supervisor's office to discuss work issues" is

not an adverse employment action, even if it causes the employee embarrassment or anxiety).

There is no evidence that Dawson lost compensation, was reassigned, had charges brought

against her, or lost promotional or transfer opportunities.  In sum, Dawson's allegations of

excessive scrutiny, monitoring, and criticisms of her job performance do not constitute an

adverse employment action.

### 2.      Remarks Evincing Alleged Age Animus

Defendants further argue that even if Dawson had demonstrated that she suffered

an adverse employment action, she has not shown that the circumstances surrounding that

adverse action give rise to an inference of discrimination.  Dawson alleges that Chin made

several remarks about Dawson's age between 2006 and March or April of 2007, including:

"When will you be retiring," and "You are a dinosaur.  So am I.  You should be replaced by a

teaching fellow."  (Def. R. 56.1 Stmt. ¶¶ 115, 116, 121-24).  Dawson concedes that Timberlake

never made any age-related comments.  (Def. R. 56.1 Stmt. ¶ 133)

The Second Circuit has held that stray remarks "without more, cannot get a

discrimination suit to a jury."  Danzer v. Norden Systems, Inc., 151 F.3d 50, 56 (2d Cir. 1998);

accord Douglas v. Dist. Council 37 Mun. Employees Fund Trust, 207 F. Supp. 2d 282, 291

(S.D.N.Y. 2002) (holding that where plaintiff was unable to provide the context in which

allegedly discriminatory comments were made, those "stray" comments failed to raise an

inference of discrimination); Ranieri v. Highland Falls-Fort Montegomery Sch. Dist., 198 F.

Supp. 2d 542, 545 (S.D.N.Y. 2002) ("Stray workplace remarks that have no demonstrated nexus

to the personnel action complained of are insufficient to defeat a motion for summary

judgment.").  Dawson testified at her deposition that she did not believe that Chin's use of the

word "dinosaur" showed hostility towards older people.  (Def. R. 56.1 Stmt. ¶ 119)  Moreover,

Chin's remarks were made in response to Dawson's comment that she was considering

retirement – either that year or the next.  Dawson elicited Chin's view on the subject, and his

remarks must be understood in that context.  (Def. R. 56.1 Stmt., Ex. AAA at DAWSON 1411)

There is no evidence that Dawson believed at the time that Chin's remarks demonstrated age

animus, and there is no evidence that Chin's comments about age were anything other than

"stray remarks."  Chin's remarks are not sufficient to demonstrate that any actions taken with

respect to Dawson took place under circumstances giving rise to an inference of discrimination.

### 3.    **Treatment of Similarly Situated Employees**

In order to prove discrimination, a plaintiff must demonstrate that similarly

situated employees were treated differently.  See Gagliardi v. Village of Pawling, 18 F.3d 188,

193 (2d Cir. 1994).  Here, Dawson has offered no such evidence.  Indeed, at her deposition,

Dawson testified that she does not know how other teachers at Chelsea were rated – whether

younger or older – and does not know what level of scrutiny, monitoring or criticism other

teachers were subjected to.  (Def. R. 56.1 Stmt. ¶¶ 63-64)

Defendants have offered evidence that between 2004 and 2008, it was not uncommon for teachers at Chelsea to receive "Unsatisfactory" ratings.  (Def. R. 56.1 Stmt. ¶¶ 98-111)  For example, in the 2005-06 school year, four Chelsea teachers received a rating of "Unsatisfactory."  The teachers' ages were:  32, 35, 46, and 51.  (Def. R. 56.1 Stmt. ¶¶ 103-04)

In sum, Plaintiff has not offered any evidence as to the treatment of similarly situated employees, and the evidence before the Court does not indicate that older teachers were targeted for poor performance ratings.

### 4.   <u>Constructive Discharge</u>

Defendants also argue that Dawson has not made out a <u>prima</u> <u>facie</u> case that her retirement at the end of the 2008-09 school year constituted a constructive discharge.  (Def. Br. at 7)  "Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily.  Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  <u>Chertkova</u>, 92 F.3d at 89 (internal quotation marks and citation omitted); <u>see</u> <u>Lopez v. S.B. Thomas</u>, 831 F.2d 1184, 1188 (2d Cir. 1987) ("A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." (internal quotation marks omitted)).  To find that an employee's resignation amounted to a constructive discharge, "the trier of fact must be satisfied that the . . . working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  <u>Lopez</u>, 831 F.2d at 1188 (internal quotation marks omitted).

Dawson has not made out a prima facie case of constructive discharge, because the undisputed evidence shows that she voluntarily resigned. Dawson did not retire at the end of the 2007-08 school year – when she received the "Unsatisfactory" evaluation – but instead retired at the end of the 2008-09 school year after a new principal, Brian Rosenblam, gave her a "Satisfactory" rating. (Def. R. 56.1 Stmt. ¶ 90) Moreover, Dawson admitted at her deposition that she voluntarily retired at the end of the 2008-09 school year. (Def. R. 56.1 Stmt. ¶ 91) Dawson testified that her retirement was motivated by her belief that she was entitled to full benefits at that time. (Def. R. 56.1 Stmt. ¶ 92)

Because the undisputed evidence shows that Dawson voluntarily resigned, she has not made out a prima facie case of constructive discharge. See, e.g., Singh v. New York State Dept. of Taxation and Fin., 911 F. Supp. 2d 223, 235 (W.D.N.Y. 2012) ("Courts have recognized that, if the employment action at issue is the result of the plaintiff's voluntary resignation . . . then the requirement of an adverse employment action is not satisfied.")

\*       \*       \*       \*

Based on the record before this Court, no "fair-minded jury" could conclude that Dawson established a prima facie case for age discrimination without engaging in "unsubstantiated speculation." Jeffreys v. City of New York, 426 F.3d 549, 553-54 (2d Cir. 2005) (citing Fujitsu Ltd. v. Fed. Express Corp., 247 F.2d 423, 428 (2d Cir. 2001)).

**B.    Non-Discriminatory Reasons for Employment Actions**

Although Dawson's failure to establish a prima facie case of discrimination is fatal to her claims, the Court finds that Defendants have also proffered legitimate, non-discriminatory reasons for their employment actions regarding Dawson.

Defendants have offered substantial evidence that Dawson refused to follow Chin's instructions and directives.  (See Def. R. 56.1 Stmt. ¶¶ 34-36, 39, 42, 43, 45-46, 52, 53, 56-66, 69-80)  There is also substantial evidence that her lessons were inadequate.  (See Def. R. 56.1 Stmt. ¶¶ 50, 51, 54, 55, 67, 68)  Dawson also had excessive absences (Def. R. 56.1 Stmt. ¶¶35-36), a disorganized class room (Def. R. 56.1 Stmt. ¶42-43), failed to start her lessons in a timely manner (Def. R. 56.1 Stmt. ¶ 55), and did not submit class materials, including grade books, lesson plans, and pacing calendar to Chin for discussion purposes.  (Def. R. 56.1 Stmt. ¶¶ 56-66)

### C.   Pretext

Where a defendant has offered legitimate, non-discriminatory reasons for its employment actions, the burden shifts back to Plaintiff to demonstrate that the reasons offered by the defendant were a pretext for discrimination.  Plaintiff must "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment actions]." Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (internal quotations omitted).

Dawson's evidence of pretext is the same evidence that she offered in attempting to make out a prima facie case.  Her discrimination claims rest on her belief that she was subjected to unfair criticism.  Dawson's disagreement with her employer's perception of her job performance is not sufficient to demonstrate that Defendants' proffered justifications for their actions were a pretext for discrimination, however.  See Bickerstaff v. Vassar Coll., 196 F.3d 435, 451 (2d Cir.1999) ("Title VII does not insulate an individual from criticism that is not based on an impermissible reason.")  "Only when an employer's business decision is so implausible as

21

to call into question its genuineness should this Court conclude that a reasonable trier of fact could find that it is pretextual."  Dister v. Continental Group,Inc., 859 F.2d 1108, 1116 (2d Cir. 1988).  Absent evidence of bias, a plaintiff must offer concrete evidence of disparate treatment. A plaintiff cannot rely upon "purely conclusory allegations of discrimination."  Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).  Plaintiff has offered no such evidence.

## III.    HOSTILE WORK ENVIRONMENT CLAIM

Relying on the same evidence, Dawson also presents a hostile work environment claim.  Defendants argue that "being subjected to supervision and scrutiny does not create a hostile work environment."  (Def. Br. at 23)

### A.    Applicable Standards

A hostile work environment claim requires a showing (1) that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and (2) that a specific basis exists for imputing the objectionable conduct to the employer.  Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997) (internal citations and quotation marks omitted).

The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered.  Leibovitz v. N.Y. City Transit Auth., 252 F.3d 179, 188 (2d Cir. 2001) (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)); Brennan v. Metro. Opera Ass'n, Inc., 192 F.3d 310, 318 (2d Cir. 1999).  This test has objective and subjective components:  the misconduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment," and the victim must also subjectively perceive that environment to be abusive.  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

As a general rule, incidents must be more than "episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Perry, 115 F.3d at 149 (citation and internal quotation marks omitted). Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness. Brennan, 192 F.3d at 318; see also Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (noting that "[w]e have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment"). It is well settled in this Circuit, however, that a single act can meet the threshold if, by itself, it works a transformation of the plaintiff's workplace. See Howley v. Town of Stratford, 217 F.3d 141, 154 (2d Cir. 2000)

In short, a plaintiff making a hostile work environment claim "must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (quoting Perry, 115 F.3d at 149). In deciding whether the threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse. Harris, 510 U.S. at 23 (relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance"); see also Cruz, 202 F.3d at 570. In order to establish an aged-based hostile work environment claim a plaintiff must, of course, demonstrate that the conduct occurred because of her age. Alfano, 294 F.3d. at 377-78.

Here, Dawson's hostile work environment claim fails for several reasons. As an initial matter, Defendants have demonstrated that the employment actions about which Dawson complains were based not on her age, but on her deficient work performance. Even if there were

evidence that the scrutiny and criticism was related to Dawson's age, such conduct does not provide a sufficient basis for a hostile work environment claim.  See Salerno v Town of Bedford, NY, 72 Fed. R. Serv. 3d 240 (S.D.N.Y. 2008) (citing Weeks, 273 F.3d at 86) ("Allegations of negative job evaluations or excessive reprimands are insufficient to establish a hostile environment claim."); Robins v New York City Bd. of Educ., 07 CIV. 3599 JGK KNF, 2010 WL 2507047, at *12 (S.D.N.Y. June 21, 2010) (plaintiff failed to establish hostile work environment claim where she based her claim on "repeated[] visit[s to] her classroom to evaluate her performance and . . . unsatisfactory reviews").

Moreover, Chin's remarks purportedly showing age animus are – for the reasons discussed above – not actionable.  There has been, in any event, no showing that Defendants' conduct was so extreme and continuous as to be "severe and pervasive."  The Chin remarks cited by Dawson were isolated and were not perceived by Dawson at the time as evincing hostility to older people.  (Def. R. 56.1 Stmt. ¶ 119)

No reasonable juror could find that Plaintiff's workplace was so permeated with pervasive harassment that it created a hostile work environment.  Defendants are entitled to summary judgment on this claim.

## IV.    DAWSON'S SECTION 1983 CLAIM

Dawson also asserts that her constitutional rights have been violated.  To the extent that Dawson alleges an equal protection claim under Section 1983 based on age discrimination, such a claim is analyzed under the same standards as a claim made pursuant to the ADEA.  See Sorlucco v. N.Y. City Police Dep't, 888 F.2d 4, 7 (2d Cir. 1989) (holding that McDonnell-Douglas burden-shifting analysis applies to a § 1983 claim); Stampfel, 2005 WL 3543696, at *3-4).  For the reasons stated above, Defendants are entitled to summary judgment

on Dawson's Section 1983 claim to the extent it is based on a purported equal protection violation.

Dawson also argues that Defendants' actions were intended to force her to retire, in an attempt to deprive her of her property rights, in violation of the Due Process Clause of the Fourteenth Amendment.

"To determine whether a plaintiff was deprived of property without due process of law in violation of the Fourteenth Amendment, we must first identify the property interest involved.  Next, we must determine whether the plaintiff received constitutionally adequate process in the course of the deprivation."  O'Connor v. Pierson, 426 F.3d 187, 196 (2d Cir. 2005).

Here, the Court assumes that Dawson's property interests were her tenured teaching position, her salary, and her state licenses.  Based on the uncontroverted evidence, Dawson was not deprived of any property interest.  Dawson's salary was not diminished, nor were her teaching licenses suspended or revoked.  (Def. R. 56.1 Stmt. ¶¶ 8, 89)  Moreover, as discussed above, Dawson's retirement was voluntary.  In sum, Dawson has not show that she was deprived of a property interest without due process.

## V.   RETALIATION CLAIM

The anti-retaliation provisions of the ADEA make it "unlawful for an employer to discriminate against any of [its] employees . . . because such individual . . . has opposed any practice made unlawful by this section, or because such an individual . . . participated in any manner in an investigation, proceeding, or litigation under this [Act]."  29 U.S.C. § 623(d).

ADEA retaliation claims are analyzed under the burden-shifting framework of McDonnell Douglas.  See Jetter v. Knothe Corp., 324 F.3d 73, 75 (2d Cir. 2003) ("We analyze

ADEA discrimination (and retaliation) claims under the burden-shifting framework of [McDonnell Douglas].”); Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 94 (2d Cir. 2001) (“We analyze a claim of retaliatory discharge under the familiar three-part burden shifting analysis that was . . . first set forth in McDonnell Douglas.”).  Under that framework, the plaintiff bears the initial burden of establishing a prima facie case of retaliation.  See Gorzynski, 596 F.3d at 106.  If the plaintiff satisfies this initial burden, “the burden shifts to the defendant to articulate ‘some legitimate, nondiscriminatory reason’ for its action.” Gorzynski, 596 F.3d at 106 (quoting McDonnell Douglas, 411 U.S. at 802).  “If the defendant provides such a reason, the motion [for summary judgment] may still be denied if the plaintiff can show that the defendant’s proffered reason was a pretext for retaliation.”  Beaumont v. Cablevision Sys. Corp., No. 10-CV-3585(JG)(SMG), 2012 WL 1158802, at *4 (E.D.N.Y. Apr. 9, 2012) (citing Gorzynski, 596 F.3d at 106).

    **A.**    **Prima Facie Case**

    In order to make out a prima facie case of retaliation under the ADEA,

> a plaintiff must adduce “evidence sufficient to permit a rational trier of fact to find [1] that [she] engaged in protected participation or opposition under . . . [the ADEA], [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.”

Kessler v. Westchester Cnty. Dep’t of Social Servs., 461 F.3d 199, 205-06 (2d Cir. 2006) (quoting Cifra, 252 F.3d at 216 (internal quotation marks omitted)); see also Graves v. Deutsche Bank Sec. Inc., No. 07 Civ. 5471(BSJ), 2010 WL 997178, at *3 (S.D.N.Y. Mar. 18, 2010) (same); Santos v. Brooks Pharm., No. 3:05-cv-889(WWE), 2008 WL 185534, at *5 (D. Conn. Jan. 18, 2008) (same).

It is well-established that a "plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as [s]he can establish that [s]he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (internal quotation marks omitted). The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including complaints to management. See Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990).

Here, Dawson claims that she was given a negative performance evaluation in June 2008 because of her involvement in two protected activities: the February 27, 2007 DOE OEO complaint, and the March 11, 2008 NYSDHR complaint. (Am. Cmplt. ¶ 49, 114) Defendants argue, however, that Dawson has not established a prima facie case of retaliation. (Def Br. at 15)  In particular, Defendants contend that the June 16, 2008 "Unsatisfactory" rating does not constitute an "adverse employment act" under Burlington Northern & Santa Fe Railway v. White, 543 U.S. 53, 68 (2006) (acts "that could well dissuade a reasonable worker from making or supporting a charge of discrimination.")  Defendants further argue, in the alternative, that even if the "Unsatisfactory" rating is an adverse employment action, Dawson's retaliation claim must be dismissed for lack of temporal proximity. (Def. Br. at 16)

In Burlington Northern, the Supreme Court made clear that the

> antiretaliation provision protects an individual not from all retaliation, but from
> retaliation that produces an injury or harm. . . . In our view, a plaintiff must show that a
> reasonable employee would have found the challenged action materially adverse, "which
> in this context means it well might have 'dissuaded a reasonable worker from making or
> supporting a charge of discrimination.'"

Burlington Northern, 543 U.S. at 67-68 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219

(D.C. Cir. 2006) (quoting Washington v. Illinois Dept. of Revenue, 420 F.3d 658, 662 (7th Cir.

2005).

      In the wake of Burlington Northern, some courts have ruled that a mere negative

performance evaluation – absent concrete negative consequences to the employee – is not

sufficient to support a retaliation claim.  Carmellino v. Dist. 20 of N.Y. City Dept. of Educ., No.

03 Civ. 5942, 2006 WL 2583019, at *32 (S.D.N.Y. Sept.6, 2006) (granting summary judgment

to employer on retaliation claim where plaintiffs "failed to produce . . . evidence of any negative

consequences resulting from the [negative] evaluations of either plaintiff"); Jackson v. City

Univ. of N.Y., 2006 U.S. Dist. LEXIS 43338, *3 (S.D.N.Y. June 26, 2006) (same).  Here, there

is no evidence that Dawson suffered any concrete injury as a result of receiving an

"Unsatisfactory" rating.  Nevertheless, the Court will assume arguendo that the "Unsatisfactory"

rating could constitute an adverse employment action under Burlington Northern – because it

might dissuade a reasonable worker from making or supporting a charge of discrimination – and

go on to consider whether Dawson has demonstrated a causal connection between her protected

activity and the "Unsatisfactory" rating.

      "A causal connection between the protected activity and the adverse action may

be demonstrated by showing '(1) direct proof of retaliatory animus directed against the

[p]laintiff, (2) disparate treatment of similarly situated employees, or (3) that the retaliatory

action occurred close in time to the protected activities.'"  Elhanafy v. Shinseki, No. 10 CV

3192(JG), 2012 WL 2122178, at *17 (E.D.N.Y. June 12, 2012) (quoting Ashok v. Barnhart, 289

F. Supp. 2d 305, 314 (E.D.N.Y. 2003) (quoting McNair v. New York City Health and Hosps.

Corp., 160 F. Supp. 2d 601, 604 (S.D.N.Y. 2001))); see also Beaumont, 2012 WL 1158802, at *6

("[A] plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by 'showing that the protected activity was closely followed in time by the adverse [employment] action.'") (quoting Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001) (quoting Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996))).

    Here, there is no direct evidence of retaliatory animus.  Dawson has likewise offered no evidence that she was treated differently than similarly situated teachers at Chelsea. Accordingly, Dawson's retaliation claim can succeed only if the alleged retaliatory action occurred close in time to her protected activity.

    "Mere temporal proximity between a plaintiff's protected activity and an adverse employment action is sufficient to create an inference of retaliation for purposes of proving a prima facie case."  Aka v. Jacob K. Javits Convention Ctr. of New York, No. 09 Civ. 8195(FM), 2011 WL 4549610, at *9 (S.D.N.Y. Sept. 30, 2011) (citing El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 932-33 (2d Cir. 2010); Simpson v. N.Y. State Dep't of Civil Serv., 166 F. App'x 499, 502 (2d Cir. 2006)); see also Pinkard v. New York City Dep't of Educ., No. 11 Civ. 5540(FM), 2012 WL 1592520, at *6 (S.D.N.Y. May 2, 2012) ("[M]ere temporal proximity between a plaintiff's protected activity and an adverse employment action may, by itself, be sufficient to create an inference of retaliation for purposes of proving a prima facie case.") (citing El Sayed, 627 F.3d at 932) ("By demonstrating temporal proximity between his complaint and his discharge, [plaintiff] arguably established a prima facie case of retaliation under Title VII."); Demaio v. Connecticut Dep't of Corr., No. 3:09-cv-2133(WWE), 2012 WL 892933, at *9 (D. Conn. Mar. 15, 2012) ("Finally, because less than a month elapsed between the Plaintiff's protected activity and the initiation of the March 2005, December 2007, and July 2008

investigations, the temporal proximity of the potentially adverse action to the protected activity permits an inference of causation sufficient to make out a <u>prima</u> <u>facie</u> case of retaliation.")); <u>Bind v. City of New York</u>, No. 08 Civ. 11105(RJH), 2011 WL 4542897, at *17 (S.D.N.Y. Sept. 30, 2011) ("Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection.") (quoting <u>Kaytor v. Elec. Boat Corp.</u>, 609 F.3d 537, 552 (2d Cir. 2010)).

"In order for temporal proximity to establish causality, [however,] the intervening period must be 'very close.'" <u>Elhanafy</u>, 2012 WL 2122178, at *17 (quoting <u>Clark Cnty. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 272 (2001)).  The Second Circuit has "not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, [but it has held in at least one case] that five months is not too long to find the causal relationship." <u>Gorzynski</u>, 596 F.3d at 110.

Here, the Court concludes that Dawson has not demonstrated a causal connection between a protected activity and the June 2008 "Unsatisfactory" rating.  The February 27, 2007 DOE OEO complaint was filed approximately sixteen months before the June 16, 2008 "Unsatisfactory" rating.  An intervening period of sixteen months is not "very close." <u>Elhanafy</u>, 2012 WL 2122178, at *17; <u>see also</u> <u>Clark County Sch. Dist.</u>, 532 U.S. 268, 273 (2001) (citing with approval cases dismissing retaliation claims where there were three and four month periods between protected activity and adverse employment action, noting that temporal proximity must be "very close"); <u>Ashok v. Barnhart</u>,  289 F. Supp. 2d 305, 314 (E.D.N.Y. 2003) (citing, <u>inter alia</u>, <u>Hollander v. American Cyanamid Co.</u>, 895 F.2d 80, 85-86 (2d Cir. 1990) (no causal connection where three months passed between EEOC complaint and alleged adverse employment action)); <u>Admassu v. Fox/Lorber Assocs., Inc.</u>, No. 99 CV.2665(GBD), 2003 WL

22290226 at *6 (S.D.N.Y. Oct. 6. 2003) (allegedly retaliatory emails sent six months after

plaintiff filed her EEOC complaint were "simply too far removed temporally from the filing of

the EEOC complaint to raise an inference of retaliation"); Khan v. Abercrombie & Fitch, Inc.,

No. 01 Civ. 6163(WHP), 2003 WL 22149527 at *9 (S.D.N.Y. Sept. 17, 2003) ("[T]he five-

month gap between her . . . addition to her . . . NYCCHR complaint and her termination,

combined with the absence of other evidence, are too great to infer a causal connection."); Lewis

v. Snow, 01 Civ. 7785, 2003 WL 22077457 at *8 (S.D.N.Y. Sept. 8, 2003) ("Plaintiff fails to

make a showing of protected activity which was 'followed closely by' the alleged retaliatory

treatment" where there was a more than three-month gap between them.); Rinsler v. Sony

Pictures Entm't, Inc., 02 Civ. 4096, 2003 WL 22015434 at *9 (S.D.N.Y. Aug. 25, 2003) ("The

almost six-month lag between [the protected activity] and the alleged retaliatory termination . . .

is too temporally remote to support a retaliation claim.") (citing cases); Stuevecke v. New York

Hosp. Med. Ctr., No. 01–CV–326, 2003 WL 22019073 at *5 (E.D.N.Y. Aug. 26, 2003)

(protected activity and termination "occurred more than five months apart – a period which is too

distant to permit a jury to find a causal connection between the two events based on time

proximity."); Sussle v. Sirina Prot. Sys. Corp., 269 F. Supp. 2d 285, 315-16 (S.D.N.Y. June 10,

2003) ("The four-month interval between the Plaintiff's [protected activity] in April 1999 and his

termination in July 1999 is insufficient evidence of a causal connection. . . . In fact, courts have

repeatedly held that a four-month interval does not establish a causal connection for the purposes

of a retaliation claim.")

    The March 11, 2008 NYSDHR complaint was filed approximately three months

before the June 16, 2008 "Unsatisfactory" rating.  While the Second Circuit has not established a

"bright line rule" with respect to the limits of temporal proximity, three months falls within the

time period sufficient to permit an inference of retaliation.  Even where there is temporal proximity, however, an inference of retaliatory animus may not arise where the adverse employment action is part of a lengthy process of performance management or progressive discipline.

In Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 95 (2d Cir. 2001), for example, the Second Circuit noted that "the adverse employment actions were both part, and the ultimate product of, 'an extensive period of progressive discipline' which began when [the employer] diminished [the employee]'s job responsibilities a full five months prior to his filing of the EEOC charges."  The court ruled that "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."

Slattery applies here.  Performance management of Dawson began more than fifteen months before she filed the NYSDHR complaint.  (See Def. R. 56.1 Stmt. ¶¶ 34-35, 42-45, 51-52, 57-58)  Accordingly, no inference of retaliation arises from the June 2008 "Unsatisfactory" rating, and Dawson has not made out a prima facie case of retaliation.[3]

## VI.   **NYSHRL AND NYCHRL CLAIMS**

Dawson also alleges violations of the New York State Human Rights Law and the New York City Human Rights Law.

The Court having determined that Defendants are entitled to summary judgment on Dawson's federal claims, it will not exercise supplemental jurisdiction over her remaining state and city law claims.  28 U.S.C. § 1367(c)(3).

---

[3]  Even if Dawson had made out a prima facie case, her retaliation claim would fail, because Defendants have demonstrated legitimate, non-discriminatory reasons for their employment actions and Dawson has offered no evidence of pretext.

## CONCLUSION

The Clerk of the Court is directed to enter judgment for Defendants on Dawson's

federal claims, and to close this case.

Dated: New York, New York
       August 19, 2013                    SO ORDERED.

                                          Paul G. Gardephe
                                          United States District Judge

33